**UNITED STATES of America**

**v.**

**Walter E. FERGUSON, Appellant.**

**UNITED STATES of America**

**v.**

**Walter Edward FERGUSON, Appellant.**

**Nos. 72–1369, 72–1370.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 13, 1973.

Decided April 16, 1974.

As Amended April 16, 1974.

Rehearing En Banc Denied July 17, 1974.

Certiorari Denied Oct. 21, 1974. See 95 S.Ct. 183.

David G. Larimer, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

George B. Driesen, Washington, D. C. (appointed by this Court), for appellant.

Before BAZELON, Chief Judge, WILKEY, Circuit Judge, and GASCH,* United States District Judge of the United States District Court for the District of Columbia.

GASCH, District Judge:

This case involves appellant's conviction for sale of narcotics under 26 U.S.C. §§ 4705(a), 4704(a), and 21 U.S.C. § 174. Appellant raises four questions, two of which are principal issues here: first, whether the trial court erred in not dismissing the indictments on the grounds that the government failed to

fulfill its promise to identify and produce at trial the informant who allegedly purchased the narcotics from the appellant, and second, whether the appellant was denied his right to a speedy trial. Of lesser importance are issues of the missing witness instruction and sentencing.

On August 27, 1969, a District of Columbia grand jury handed down an indictment charging appellant with having sold a narcotic drug to "a certain individual" in the District of Columbia "on or about May 20, 1969," in violation of the federal narcotics laws.[1] On September 12, 1969, appellant was arraigned and placed on bond. Appellant's retained counsel encountered disciplinary problems and became unavailable shortly after commencing to prepare this case for trial, and on December 15, 1969, the trial court appointed other counsel to represent appellant. On April 2, 1970, appellant retained new counsel and the trial court thereafter relieved appointed counsel.

On June 9, 1970, a grand jury in the District of Maryland handed down a ten-count indictment charging appellant and another individual, *inter alia*, with similar violations of the federal narcotics laws alleged to have occurred in Maryland on May 19, 1969. After the issuance of a bench warrant, appellant was finally arrested and later arraigned in the United States District Court for the District of Maryland on November 6, 1970.

On November 19, 1970, appellant's Maryland counsel filed a motion to transfer the proceedings to the District of Columbia. On January 20, 1971, the government requested a hearing on the pending motion, and on May 14, 1971, a status conference was held in Baltimore before Judge James R. Miller, Jr. After obtaining the consent of his codefendant, appellant filed another request to

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. Specifically, count one of the indictment charged a violation of 26 U.S.C. § 4705(a);

count two charged a violation of 26 U.S.C. § 4704(a); and count three charged a violation of 21 U.S.C. § 174.

transfer the proceedings to this jurisdiction. The government agreed with appellant's request, and the Maryland federal court transferred the proceeding to the District of Columbia on June 22, 1971.

On July 22, 1971, the court below held a hearing on appellant's motion to disclose the informant's identity and his motion to dismiss for want of a speedy trial. At that time, the government resisted disclosure of the informant's identity, arguing that such disclosure prior to trial would endanger his safety. The court ruled in favor of the government, noting that if the informant's identity were revealed at that time it would certainly decrease his chances for survival. Appellant's motion to dismiss for want of a speedy trial was also denied.

On October 15, 1971, appellant and his codefendant were arraigned on the transferred case and the two cases were consolidated for trial. On October 27, 1971, a bench warrant was issued for appellant. On November 1, 1971, the government announced that it was ready to proceed on the District of Columbia indictment, but stated that it had lost contact with the informant, whose identity was then revealed. The government indicated that he probably would not be available to testify. Appellant then moved to dismiss the indictment. The court below denied the motion to dismiss, and further denied appellant's renewed motion to dismiss for want of a speedy trial. The bench warrant was later executed on November 5, 1971, the

appellant was committed and the jury trial commenced on November 10, 1971. Appellant was convicted, and sentenced on March 23, 1972, to five years on count one, two to ten years on count two, and five years on count three on each of the two indictments. Count one of the District of Columbia indictment was to run consecutively to count one of the Maryland indictment. Counts two and three of the respective indictments were to run concurrently with count one of the indictments.

I.

■ Relying primarily on Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), appellant argues that the trial court committed reversible error in not dismissing the indictments on the ground that the government informant, who was present during the narcotics transaction, was not available for the trial in this case.[2] In *Roviaro*, the Supreme Court decided that under certain circumstances, the withholding of an informant's identity and his failure to testify at trial could result in such grave prejudice to the defendant that the government's case must be dismissed. The Court emphasized the fact that such a determination can only be made with respect to the facts of each particular case:

> We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against

2. The dissent contends that we have misunderstood the issue. But revealing the identity of the informant is only a step to enable the appellant either (1) to obtain the informant's testimony at trial, incident to which counsel would seek to interview him prior to trial, or (2) to reconstruct in the appellant's mind the appellant's relationship and contacts with the informant, and perhaps offer the testimony of third parties as to appellant's relationship with the informant. In this case, revealing the identity of the informant earlier would not have helped the appellant get the informant's testimony—the appellant had no power to detain the informant or protect him. The informant still

would not have been present at trial; the informant probably would have been eliminated sooner. So, the fact that the government did not identify the informant until after the informant had disappeared is meaningless. The government did identify the informant in time for the appellant to reconstruct his dealings, if any, with the informant and to present evidence of his own and of third parties at the trial on this point, if he desired. There was no power either in the government or the appellant to have obtained the informant's testimony at trial, no matter when the informant's identity was revealed.

the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

353 U.S. at 62, 77 S.Ct. at 628.

In reviewing the totality of the circumstances in this case, we must begin with those circumstances that caused the conviction of Roviaro to be reversed. Roviaro had engaged in a narcotics transaction with an informant, during which a Chicago police officer lay secreted in the trunk of the informant's car. There were no immediate witnesses to the sale, although two federal agents and a second police officer observed from a distance. Thus, the informant was an integral part of setting up the crime,[3] and the Court found that, in the absence of other witnesses, was the only means by which the appellant could explore any possible entrapment by the government.[4]

The facts in the case now before us distinguish it from *Roviaro*. The most significant distinction is that in *Roviaro* the government refused throughout to disclose the identity of the informant. Here, the government represented to the Court that the informant would appear as a witness for the government and that his identity was being withheld for reasons of his safety. Here, ten days before the trial, the government did reveal the identity of the informant and disclosed further that the government had lost touch with him. Unlike the situation in *Roviaro*, the government did not refuse this information throughout the course of the trial. The record further reveals that the government planned to call the informant at trial as a witness. This it had done in prior cases in which this informant had been of assistance. The government suggested, and the District Court ruled, that it was unnecessary and inappropriate to disclose the informant's identity prior to trial because it would undoubtedly jeopardize the informant's life.[5] Considering the government's need for a continuing flow of information on the narcotics traffic, the obvious perils inherent in the narcotics traffic[6] and the dangerous role played by an informant, we find that the lower court's determination to postpone disclosure until the time of

---

3. 353 U.S. at 64, 77 S.Ct. 623. This distinguishes the case at bar and *Roviaro* from cases involving withholding the identity of an informant who merely pointed out persons involved in narcotics for police observation or apprehension. *See* McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967).

4. 353 U.S. at 64, 77 S.Ct. 623.

5. The record reveals that the informant had testified earlier in the *"Tantillo-Jackson* conspiracy case" and due to the violence that occurred in connection with that case, it was not unreasonable to be concerned about the physical welfare of the informant. It is noted that one of those expected to be a witness, Charles "Popeye" Hailes, was gunned down on the steps of his home. See United States v. Mace Brown, Nos. 71–1446; 72–1029, in which the hired killer was convicted of first degree murder. These appeals were dismissed on motion of the government on February 23, 1973, due to the escape of appellant Brown from D. C. Jail

on October 2, 1972. Appellant Brown was killed during the course of a bank robbery in New York on April 18, 1973.

6. The experienced and conscientious trial judge (Aubrey E. Robinson, Jr.), during the course of the July 22, 1971, hearing observed at pages 8–9 of the transcript:

"THE COURT: It has been this court's experience in this particular area involving narcotics, the informers, that to disclose the informer's identity would be just the same as executing him. That has been the experience of this court: that wherever informers have been involved, the government has been required to go to great lengths to protect their lives prior to trial, during the trial, and after the trial.

This court has heard testimony where there has been deliberate executions of people involved in the narcotics traffic.

No, the government will not be required to disclose the identity of the informer in this case until such time as the trial date has been set—until the date of trial, rather."

trial was not unreasonable under the circumstances. The dissent indicates that since the government had produced this informant as a witness in the *Tantillo-Jackson* conspiracy that it should have offered an explanation as to why it would have been unsafe to disclose his identity prior to the time it expected to call him in this case. It seems clear that if an informant is the target of one group of narcotics violators in one case, he would be more, not less, vulnerable when his identity is revealed in a second case. Certainly he should not be considered out of danger because he had concluded his testimony in the *Tantillo-Jackson* case. The risk to the informant's safety would be materially increased because the revelation of his identity would give the underworld from which illicit narcotics flow a stronger motive for eliminating him. Apparently the informant has been eliminated.

Since in the instant case the informant's identity was revealed ten days before the trial, the *Roviaro* case cannot be relied on for the immutable proposition that the absence at trial of an informant who was an active participant in the narcotics transaction necessarily requires the sanction of dismissal.[7]

The dissent points to this Court's decision in United States v. Bryant, 142 U.S.App.D.C. 132, 439 F.2d 642 (1971). In that case a recording of a conversation between a narcotics agent and the appellant had unaccountably been lost. This Court called upon the government to provide procedures for the safeguarding of such Jencks material and held that in the future unless such procedures were established so that discoverable evidence might be preserved, sanctions for nondisclosure will be invoked. The spirit of *Bryant*, the dissent says, should be applied to the clearly distinguishable situation with which the Court is confronted in the instant case. We disagree. It is one thing to safeguard such inanimate objects as recordings of conversations. It is quite another to require that government witnesses be secured for the purpose of a future trial. Witnesses, like defendants released on bond, do disappear. The sanction of dismissal in a case in which the government satisfied the trial judge that it had exercised reasonable care to safeguard the informant should not be invoked under the circumstances of this case.[8] In the more recent case of United States v. Perry, 153 U.S.App.D.C. 89, 471 F.2d 1057 (1972), in a situation also involving a lost Jencks Act statement, we took a somewhat different position than in *Bryant*. We emphasized that unless the interests of justice will be furthered by penalizing the government, then the penalty is not to be invoked automatically as in an adversary game. We also said that "[I]n order to exclude testimony [under the Jencks Act], there should be a showing of either negligence or purposeful destruction accompanied by either bad motive or bad judgment."[9] The trial court's decision to exclude the

---

7. "What *Roviaro* thus makes clear is that this Court was unwilling to impose any absolute rule requiring disclosure of an informer's identity even in formulating evidentiary rules for federal criminal trials." McCray v. Illinois, 386 U.S. 300, 311, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967).

8. On November 1, 1971, the trial court denied appellant's motion to dismiss the indictments based on the inability of the government to locate the informant. The record reveals that wide-ranging inquiries were made pursuant to a request of the United States Attorney in the first part of September, 1971, nearly three months before trial. Specifically, these efforts consisted of checking with offices of the Bureau of Narcotics and Dangerous Drugs in New York and the west coast, the Washington, D. C., police department, the New York City police department, and with the informant's family, then living in the Washington, D. C., area. See proceedings of November 11, 1971, transcript at 54–56, 60–62.

Where the government has been unable to locate the informant, the trial court must be shown that "reasonable efforts to produce him were fruitless. . . ." United States v. Makekau, 429 F.2d 1403, 1404 (9th Cir. 1970). That test has been met here. United States v. Guerra, 334 F.2d 138, 142 (2d Cir. 1964).

9. 153 U.S.App.D.C. at 99, 471 F.2d at 1067.

witness' testimony in *Perry* for the reason that the grand jury transcript of her testimony had been lost was reversed and the case remanded. Here, the sanction sought is dismissal of the indictment. Clearly such a drastic penalty on the showing made in this case would not be in the interest of justice. In *Perry*, we said, respecting *Bryant*, that "even though Jencks Act information has been lost or destroyed

> criminal *convictions* otherwise based on sufficient evidence *may* be permitted to stand so long as the Government made 'earnest efforts' to preserve crucial materials and to find them once a discovery request is made." [10] (Footnote omitted; emphasis in original).

Here, the record discloses that the trial judge was satisfied with the representations made by the government concerning efforts to locate the missing witness. It is noted that appellant has made no showing that the missing informant would have been of any assistance to the defense. This informant testified for the government in the *Tantillo-Jackson* case and had been of assistance to the government in other matters. That such a witness as this would have helped the defense is sheer speculation.

The second distinction between *Roviaro* and this case is that in *Roviaro* the informant was the only close witness to the transaction. Other government witnesses were positioned at some distance, and one was secreted in the trunk of the informant's car. In the instant case appellant could have called a Miss Kathleen Phillips, who was present with Agent Cooper on the May 20, 1969, transaction. The presence of Agent Cooper may not remove the doubts expressed in *Roviaro* that the appellant would not, without the informant, be able to explore a possible entrapment by the government, but

while we would not expect government witnesses to perjure themselves, we note in the presence of Miss Phillips [11] a means by which the appellant might seek to present testimony about the transaction that would disclose any indications of entrapment. Although appellant chose not to put Miss Phillips on the stand,[12] she was available to testify on this point, and we feel that her availability is sufficient to overcome any doubts concerning the transaction on May 20, 1969.

Another distinction is that in *Roviaro* one government witness testified that the informant had denied knowing Roviaro and said that he had never even seen him before.[13] This testimony may have carried considerable weight with the Court, casting doubt on the soundness of the government's case. Here, there has been no such testimony or similar doubts respecting the government's case.

Here, the government represented in good faith that it would produce the informant at the time of trial and call him as a witness as it had done in other comparable cases. Ten days before the trial, government counsel disclosed that it had lost contact with the informant and that efforts to locate him were to no avail. His identity was revealed. Since this man had testified for the government in the *Tantillo* case, there is little or no reason to believe that his testimony would have been of any assistance to the defense in this case.

In sum, considering the circumstances of the instant case, we conclude that the appellant's contention for reversal of his convictions on the authority of *Roviaro* is unsound.

## II.

As to the speedy trial claim, this Court must once again apply a balancing test. That test was set forth by the Su-

---

10. 153 U.S.App.D.C. at 97, 471 F.2d at 1065.

11. It should be noted, however, that Miss Phillips was not present, so far as the record discloses, during the narcotics transaction on May 19, 1969.

12. Miss Phillips evidently expressed a desire not to testify for fear of self-incrimination

and fear for her personal safety. Appellant's Brief at 12, n. 12. The record reflects that the case against her was severed and dismissed at the start of the trial on November 10, 1971.

13. 353 U.S. at 64–65, 77 S.Ct. 623.

preme Court in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972):

> A balancing test necessarily compels courts to approach speedy trial cases on an *ad hoc* basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. (Footnote omitted).

*Id.* at 530, 92 S.Ct. at 2192. *See also,* United States v. Bishton, 150 U.S.App. D.C. 51, 53–54, 463 F.2d 887, 890 (1972); Hinton v. United States, 137 U.S.App.D.C. 388, 392, 424 F.2d 876, 880 (1969); Hedgepeth v. United States (Hedgepeth II); 125 U.S.App.D.C. 19, 21, 365 F.2d 952, 954 (1966).

In order to facilitate the balancing of all factors, a review of the key dates in this case may be helpful.

| Date | Event | Months Elapsed |
|------|-------|-------|
| May 19–20, 1969 | Narcotics transactions | 0 |
| Aug. 27, 1969 | D. C. indictment | 3 |
| Sept. 12, 1969 | Appellant arraigned in D.C.; retained counsel enters appearance | 4 |
| Dec. 15, 1969 | Second attorney appointed after retained counsel was vacated | 7 |
| Apr. 2, 1970 | Appellant retains new counsel | 11 |
| June 9, 1970 | Maryland indictment | 13 |
| Nov. 19, 1970 | Appellant's Maryland motion to transfer | 18 |
| Jan. 20, 1971 | Government requests hearing | 20 |
| June 24, 1971 | Appellant's motion to transfer to D. C. granted | 25 |
| Nov. 10, 1971 | Trial | 30 |
| March 23, 1972 | Sentencing | 34 |

As can plainly be seen, the time period between appellant's initial apprehension by the police and trial was 26 months. This delay is clearly suspect; [14] but analysis of the various delays involved show that a speedy trial contention is unsound.

First, appellant went through two changes of counsel, finally retaining his permanent counsel on April 2, 1970, seven months after his arrest. Of course, the government cannot be held responsible for appellant's difficulties in securing legal representation. *See* United States v. Moss, 141 U.S.App.D.C. 306, 308–309, 438 F.2d 147, 149–150 (1970). Next, appellant attempted to transfer the Maryland indictment to the District of Columbia on November 19, 1970, but acknowledged that his Maryland codefendant, Miss Phillips, opposed; it was not until June 18, 1971, that his codefendant agreed. This additional seven-month delay should not in fairness be charged to the government, though it is not entirely attributable to the appellant.

The remaining periods to consider are, first, the seven months from the time appellant retained counsel (April 2, 1970) to appellant's motion to transfer (November 19, 1970). Logically, some of this time must be charged to appellant in order to give his retained counsel a chance to gain familiarity with the case. Furthermore, during this time, various motions were filed by appellant in his District of Columbia case, including a motion to dismiss for lack of speedy trial and a motion for discovery. The fact that the U. S. Attorney in Maryland filed an indictment during this period (June 9, 1970), only complicated the issues, and led to the continuance of the

14. A delay of more than one year between arrest and trial raises a speedy trial claim of *prima facie* merit. Hedgepeth v. United States (*Hedgepeth I*), 124 U.S.App.D.C. 291, 293, 364 F.2d 684, 686 (1966).

The Maryland indictment was returned on June 9, 1970, approximately thirteen months after the alleged transaction. The Supreme Court in United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) said:

> No opinions of this Court intimate support for appellees' thesis, and the courts of appeals that have considered the question in constitutional terms have never reversed a conviction or dismissed an indictment solely on the basis of Sixth Amendment's speedy trial provision where only pre-indictment delay was involved. (Footnotes omitted.)

404 U.S. at 315, 92 S.Ct. at 460.

District of Columbia case until the appellant's motion to transfer from Maryland was acted upon. However, in sum, this period of delay was hardly "arbitrary, purposeful, oppressive or vexacious." [15]

Lastly, there is the five-month period from transfer to trial (June 22, 1971, to November 10, 1971). During this period there were three hearings and an arraignment on the transferred case; the government sought no continuances. In light of these circumstances, and considering the inevitable "institutional delay" of a trial court's calendar,[16] we cannot say that this portion of the delays impaired appellant's right to a speedy trial.

Two further points remain here. First, appellant contends that he suffered irreparable prejudice due to the delay, because he was unable to discover and secure the testimony of the informant. While the appellant may have had some additional difficulties because of the delay, we cannot say that it substantially prejudiced appellant's defense. In light of the informant's prior conduct of assisting the government in apprehending and convicting narcotics dealers, it is not reasonable to conclude [17] that the informant would reverse his previous course and provide any significant aid to the defense. The informant was to be a government witness; delay impaired the prosecution, not the defense; without the delay the informant would have been available and would have testified. Second, considering the strength of the government's case, it is unlikely that the informant's expected testimony would have altered the ultimate result. Even assuming that appellant was prejudiced by the delay in the proceedings below, it is mostly attributable to him since he was largely responsible for initiating the motions and procedures which result-

ed in the delay and the eventual absence of the informant at trial. Consequently, appellant "either contributed to, acquiesced in, or suffered little prejudice from these lapses."[18] It should be noted that appellant was on bail except for a period of about one week prior to trial.

Thus, having taken all factors into account in light of Barker v. Wingo, we conclude there has been no deprivation of the right to a speedy trial. In United States v. Holt, 145 U.S.App.D.C. 185, 448 F.2d 1108 (1971), mentioned by the dissent in footnote 12, the delay between arrest and trial was 30 months. This Court affirmed the conviction.

### III.

■ As to appellant's missing witness point, we believe the trial court acted well within its discretion in refusing to instruct the jury on the implications of the absence of the informant. Burgess v. United States, 142 U.S.App.D.C. 198, 440 F.2d 226 (1970), indicates the nature of this discretion:

> When the court is asked to give the instruction, then, a judgment is to be reached as to whether from all the circumstances an inference of unfavorable testimony from an absent witness is a natural and reasonable one. . . . While the context in which the question arises may clothe the missing witness with significance, there is the danger that the instruction permitting an adverse inference may add a fictitious weight to one side or another of the case. . . . [T]he court is entitled to reserve to itself the right to reach a judgment as wisely as can be done in all the circumstances. . . . [19]

In light of the trial court's finding that the informant was not available, and therefore not "peculiarly within

15. Smith v. United States, 118 U.S.App.D.C. 38, 41, 331 F.2d 784, 787 (1964) (*en banc*); Hinton v. United States, 137 U.S.App.D.C. 388, 393, 424 F.2d 876, 881 (1969).

16. *See United States v. Jones*, 154 U.S.App. D.C. 211, 475 F.2d 322 (1972).

17. *See* United States v. Skeens, 145 U.S. App.D.C. 404, 408, 449 F.2d 1066, 1070 (1971).

18. United States v. Canty, 152 U.S.App.D.C. 103, 107, 469 F.2d 114, 118 (1972).

19. 142 U.S.App.D.C. at 206, 440 F.2d at 234.

[the government's] power to produce," [20] there was no error in refusing to give such an instruction.

### IV.

■ Finally, on the point of sentencing, we do find that appellant has a valid objection. There clearly was intended to be one sale of narcotics; however, due to some misunderstanding, the full quantity of narcotics purchased was not delivered on May 19, 1969. Thus, the May 20, 1969, exchange, we believe, should be treated as part and parcel of the May 19 sale, and concurrent sentences should be imposed rather than consecutive ones under count one of each indictment.

The government's reliance on Harris v. United States, 359 U.S. 19, 79 S.Ct. 560, 3 L.Ed.2d 597 (1959); Gore v. United States, 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958), and Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), is misplaced, as these cases involved consecutive sentencing under different sections of narcotics laws for one sale or transfer of narcotics. The Court's rationale in that line of cases has been that Congress enacted those statutes at different times, each time with a specific legislative purpose being served. The connection between these cases and the one at bar, where consecutive sentences were imposed under the same narcotics statute (26 U.S.C. § 4705(a)) for a two-part transaction, is not compelling. Further, because the Maryland indictment was transferred to the District of Columbia and consolidated for trial with the District of Columbia indictment, the mere fact that the exchanges occurred in different jurisdictions does not require the imposition of consecutive sentences.

The conviction of appellant is hereby affirmed, and the case remanded to the District Court for resentencing.

BAZELON, Chief Judge (dissenting):

Appellant's main contentions on appeal are: (1) that the trial court erroneously denied his motion for pre-trial discovery of the identity of the government informant to whom he allegedly sold narcotics; and (2) that he was denied a speedy trial by the lapse of twenty-seven months between his indictment and trial which resulted in the loss of the government informant. The majority rejects these claims. I respectfully dissent from both holdings of the court.

### I.

Appellant allegedly agreed to sell one ounce of heroin to a police informer in Maryland on May 19, 1969. After the transaction was completed, the informer, and a police officer with whom he was working, discovered that they had only received half of an ounce; accordingly, another meeting was set up with appellant on the following day, May 20, 1969, in the District of Columbia, so that the other half ounce could be delivered.

On August 27, 1969, appellant was indicted in D.C. for the May 20 transaction; and on June 9, 1970, almost one year after the D.C. indictment, he was indicted in Maryland for the May 19 transaction. On November 19, 1970, his Maryland counsel moved to transfer the Maryland case to D.C. so that it could be consolidated with the D.C. case. On June 22, 1971, the Maryland district court granted the motion for transfer.

Before return of the Maryland indictment, appellant filed a motion in the D. C. case on April 23, 1970, requesting "the name, home and business address, and corresponding telephone number of the 'certain person' [i. e. the informant] noted in the indictment." Fifteen months later, on July 22, 1971, the U. S. Attorney informed Judge Robinson at a status hearing that he did not plan to disclose the identity of the informant because "we do not feel that we have to, or his whereabouts." The following colloquy ensued:

> The Court: What is the government's problem with the informant?

---

20. Graves v. United States, 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893).

U. S. Attorney: Problem with the informant, Your Honor?

The Court: I do not think it is sufficient for the government to say that they just do not want to reveal the name, because there are circumstances under which it will be revealed prior to trial.

U. S. Attorney: *It will be revealed at trial.* The government does not intend to identify him, unless Your Honor orders that we must. (Emphasis supplied.)

The Court: I want to know why I should not.

U. S. Attorney: Because of his safety.

The Court: *I think I have an obligation to establish a record upon which a judgment can be made, counsel. I do not think the government can come in here and just say, "Well, we do not want to."* (Emphasis supplied.)

After repeated assurances that "at the time of trial [the informant] will be identified. He will testify in this case," and that "if something were to happen to [the informant], it would certainly impair our ability to proceed to trial," the court, concerned for the safety of the informant, agreed that his identity need not be revealed until trial.

The court next considered appellant's motion for dismissal of his D.C. indictment for lack of a speedy trial. Appellant pointed out that "some twenty-seven months have elapsed since [the time of the offense.]"[1] He also stated that "the only way, real way, that we could be prejudiced is if, unfortunately, something happened inadvertently to either [the police officer] or the informer." The court denied this motion noting that

no prejudice had resulted from the delay, and that much of the delay was due to the transfer of the Maryland case to D.C.

At a subsequent hearing on November 1, 1971, before Judge Walsh, a different U. S. Attorney indicated that "the informer will not testify in this case. He is not available for testimony in this case." Apparently the informer, who had testified in several other narcotics cases, had disappeared out of fear of reprisal. The prosecutor claimed that despite diligent efforts to locate him, they had "lost him, so to speak," and that "[t]o my knowledge the government has been willing, certainly since the end of the *Tantillo* conspiracy case which was tried in the [sic], in 1970 to advise counsel if he so chose to find out, the name of the informant." The U. S. Attorney who had appeared at the earlier hearing before Judge Robinson was also present at the November 1 hearing. He corrected his colleague, and informed the court that although the informer was identified in the *Tantillo* case, "the man's safety was involved and we didn't care to divulge [his identity at the July 22 hearing] and the court did not require us to."

On November 10, 1971, the day of trial, the court denied appellant's motion for a dismissal of his indictment on the ground that he was denied a speedy trial due to the lengthy delay attended by the loss of the informant. Appellant was then convicted by a jury on all three counts of each of the two indictments. He received a five year sentence on counts one and three of each indictment, and a two to six year sentence[2] on count two of each indictment. The sentence on count one of the D.C. indictment was

---

1. Appellant initially filed a motion to dismiss his indictment for lack of a speedy trial on April 23, 1970, claiming that the four month lapse between the D.C. offense and appellant's D.C. indictment violated Ross v. United States, 121 U.S.App.D.C. 233, 349 F.2d 210 (1965), and its progeny, which prohibit unnecessary delays between the offense and indictment. At the June 22, 1971, hearing, appellant's counsel abandoned the *Ross*

claim, and argued instead that appellant was denied a speedy trial by the delay between the offense and trial.

2. At the March 23, 1972, sentencing hearing the court below imposed a sentence of two to ten years on count two of each indictment. The judgment entered pursuant to that hearing, however, indicates a sentence of two to six years.

imposed consecutive to that on count one of the Maryland indictment; all other sentences were imposed concurrently.

## II.

Appellant claims that at the July 22, 1971, hearing the government prejudiced his rights under *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L. Ed.2d 639 (1957), by withholding important information, and making a critical representation without adequate investigation. I ,believe: (A) the majority fails to address this claim because it attributes a different *Roviaro* claim to appellant; and (B) the claim appellant makes is meritorious.

## A.

Although appellant contends that he was prejudiced by the government's actions "because the informer was not *identified before trial*," the majority opinion nevertheless asserts that "appellant argues" there was "reversible error" because the "informant . . . was not *available for the trial*." [3] (Emphasis supplied.) The majority's justification for refusing to consider appellant's claim for pre-trial disclosure, and the effect of the government's actions thereon, is that:

> revealing, the identity of the informant is only a step to enable the appellant either (1) to obtain the informant's testimony at trial, incident to which counsel would seek to interview him prior to trial, or (2) to reconstruct in the appellant's mind the appellant's relationship and contacts with the informant, and perhaps offer the testimony of third parties as to appellant's relationship with the informant.

*Roviaro*, itself, however, specifically identifies still a third reason for pretrial disclosure that the majority ignores:

> The desirability of calling [the informant] as a witness, *or at least interviewing him in preparation for trial*, was a matter for the *accused* rather than the Government to decide. 353 U.S. at 64, 77 S.Ct. at 629 (emphasis supplied).

The Supreme Court's use of the disjunctive "or" indicates that the defendant

3. The court rejects the argument it mistakenly attributes to appellant on the ground that "the *Roviaro* case cannot be relied on for the immutable proposition that the absence at trial of an informant who was an active participant in the narcotics transaction necessarily requires the sanction of dismissal." Subsequent to *Roviaro*, however, this court decided United States v. Bryant, 142 U.S.App.D.C. 132, 439 F.2d 642 (1971), which held that the government was responsible for "losing" evidence "unless [it] can show that it has promulgated, enforced and attempted in good faith to follow rigorous and systematic procedures designed to preserve . . . evidence." When the informant is a special employee of the government, whose identity the government seeks to protect until trial, the spirit, if not the holding, of *Bryant* requires the government to adopt adequate procedures which reasonably insure against his loss.

My brethren state that *Bryant* should not be applied to special government informants because "[i]t is one thing to safeguard such inanimate objects as recordings of conversations. It is quite another to require that government witnesses be secured for the purpose of a future trial. Witnesses, like defendants released on bond, do disappear." The court appears to miss the point of *Bryant*. Inanimate evidence, too, disappears sometimes. The point is that when the government has sole access to important evidence or witnesses it should undertake diligent efforts to insure that the evidence or witness is not lost. While there is testimony in this record indicating that the government attempted to locate the informer once he disappeared, there is nothing to suggest that any efforts were made to prevent him from disappearing in the first place. In view of the government's promise to produce the informant at trial, such efforts were especially necessary here.

The majority also states that "[i]n the more recent case of United States v. Perry, 153 U.S.App.D.C. 89, 471 F.2d 1057 (1972), . . . we took a somewhat different position than in *Bryant*." On the contrary, both the court and Judge Wright in a special concurring opinion were careful to point out that nothing in *Perry* "affects our holding in *Bryant*" since the loss of evidence in *Perry* "occurred prior to *Bryant*." 471 F.2d at 1068 (concurring opinion), and note 35 (court's opinion).

has the right to interview an informant irrespective of whether he intends to call him as a witness. Indeed, as this court recognized in United States v. DeCoster, 487 F.2d 1197 (C.A.D.C.1973), unless counsel interviews a witness he obviously is unable to make an informed decision as to whether to call him to testify.

The majority also justifies its refusal to consider appellant's claim for pre-trial disclosure by resting on the speculation that if "the informant [had been revealed] earlier, . . . [he] still would not have been present at trial; [he] probably would have been eliminated [*i. e.* murdered] sooner." [4] This assertion is wholly unsupported in the record; so far as the present record reveals, earlier disclosure may well have assisted appellant to secure the informant's presence at trial, if appellant so chose.

In short, the court was plainly required to consider whether appellant's right to *pre-trial disclosure* was abridged because appellant's opportunities to interview the informant in preparation for trial and to call him as a witness were prejudiced by the delay in disclosure.

**B.**

It is well settled that when an informant is "an active participant" in the criminal transaction—as he was in this case—his identity must be disclosed; [5] thus, the question here is simply *when* was disclosure required. In *Roviaro*, in a factual setting remarkably similar to the present case, the Court held that "the [trial] court erred also in denying, *prior to trial,* petitioner's motion for [the identity and address of the informant] . . . [s]ince . . . it was evident from the face of the indictment that [the informant] was a participant in and a material witness to th[e] sale." 353 U.S. at 65 n. 15, 77 S.Ct. at 630 (emphasis supplied). Despite this plain language, however, we need not decide whether *Roviaro* intended to set down an inflexible rule requiring pretrial disclosure when the informant is a participant. For even if *Roviaro* permits a delay of disclosure in order to protect the informant,[6] such delay clearly may not prejudice the defendant's opportunity to interview him, as it did in this case.

Although the trial court attempted to "establish a record" at the July 22 hear-

4. Nothing in the record supports the majority's repeated suggestion that the informant has been "eliminated," let alone its completely gratuitous assertion that earlier disclosure in this case probably would have hastened his demise. On the contrary, both the U.S. Attorney and the supervising officer from the Bureau of Narcotics and Dangerous Drugs, indicated that they did not know whether the informant was "dead or alive." Tr. Nov. 10, 1971, at 20; Tr. Nov. 11, 1971 at 55.

5. Skeens v. United States, 145 U.S.App.D.C. 211, 449 F.2d 1066, 1071 (1971). *See also* Roviaro v. United States, 353 U.S. 53, 77 S. Ct. 623, 1 L.Ed.2d 639 (1957) ; United States v. Miramon, 443 F.2d 361 (9th Cir. 1971) ; Lopez-Hernandez v. United States, 394 F.2d 820 (9th Cir. 1968) ; United States v. Barnett, 418 F.2d 309 (6th Cir. 1969) ; United States v. Roberts, 388 F.2d 646 (2nd Cir. 1968).

Although *Roviaro* and its progeny clearly strike the balance in favor of disclosure

whenever the informant is a participant in the criminal transaction, the majority continually refers to *Roviaro's* "balancing" test "with respect to *disclosure*" as if the balance had not already been struck. (Emphasis supplied.) Thus, the court appears to attach some relevance to the fact that Miss Phillips "was present . . . on the May 20, 1969 transaction." If this fact is relevant to disclosure—and I maintain that it is not—the court was required to distinguish between the May 20 and May 19 transactions because Miss Phillips was not present at the latter. No such distinction is considered.

6. The safety of narcotics informants presents a serious problem that *may well justify* some delay in pre-trial disclosure. In such cases, however, the government should be required to make reasonable efforts—such as invoking protective custody—to protect against the informant's disappearance. *See* note 3 *supra.*

ing on which to decide appellant's motion for pre-trial disclosure, the government failed to reveal [7] that the informant had testified at several other trials.[8] This fact was critically relevant to the court's determination of whether delay was required to protect the informant since he was already known to the narcotics underworld.[9] It also bore on the likelihood that the informant might leave this jurisdiction and "relocate," and for that reason, too, it was important to a determination regarding the timing of disclosure.

Moreover, at this same hearing, the U. S. Attorney repeatedly assured the court that the informant would be present at trial, thereby giving the impression that the government knew the informant's whereabouts and had some means by which to secure his presence at trial. This representation was apparently made without contacting the Bureau of Narcotics and Dangerous Drugs, which has responsibility for monitoring the location of narcotics informants.[10] If the Bureau had been contacted, the government might have discovered that the informant had been, or was about to

be, relocated in another jurisdiction, or that the Bureau had lost track of him. In any of these situations, immediate disclosure would be required to insure maximum protection of appellant's rights.

Thus, the government's failure to reveal a material fact, and its making of an important representation without adequate inquiry, misled the trial court, and thereby prejudiced appellant's right to interview, and, perhaps, call the informant. Accordingly, his conviction should be reversed, and if the informant cannot now be located, his indictment must be dismissed.

### III.

Appellant also claims that he was denied his constitutional right to a speedy trial because twenty-seven months elapsed between his indictment and trial.[11] We have repeatedly held that "[t]ime is the most important factor; 'the longer the delay between arrest and trial the heavier the burden on the Government.'"[12] We need not decide, however, whether the government adduced adequate explanations [13] to justify

---

7. *See* Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963); Levin v. Katzenbach, 363 F.2d 287, 124 U.S.App.D.C. 158 (1966); Levin v. Clark, 133 U.S.App.D. C. 6, 408 F.2d 1209 (1967).

8. *See* Trial Tr., Nov. 11, 1971, at 37.

9. *See* Roviaro, *supra*, 353 U.S. at 60 & n. 8, 77 S.Ct. 623. The majority claims that the informant "should not be considered out of danger because he had concluded his testimony in [other cases]." This determination, regardless of its merit, is for the trial court, not the government. Indeed, in this case, one of the U.S. Attorneys informed the court that he believed the government was willing to disclose the informant "since the end of the *Tantillo* case," which was more than nine months before the July 22, 1971, hearing.

10. *See* Trial Tr., Nov. 11, 1971, at 56, 62.

11. The majority only discusses appellant's speedy trial claim on the D.C. case; its rejection of that claim, which was based on a twenty-seven month delay, results, *a fortiori*, in rejection of the Maryland claim, which involved a seventeen month delay be-

tween indictment and trial. The Maryland offense however, was committed the day before the D.C. offense, and thirteen months lapsed before return of the Maryland indictment. *See* Ross v. United States, 121 U.S. App.D.C. 233, 349 F.2d 210 (1965). *Compare* United States v. Marion, 404 U.S. 307, 315 n. 8, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). In these circumstances, I would also find appellant's speedy trial claim on the Maryland indictment meritorious, although I will, for convenience, discuss only the D.C. indictment in text.

12. United States v. Holt, 145 U.S.App.D.C. 185, 186, 448 F.2d 1108, 1109 (1971) (opinion of Leventhal, J.), *quoting* Hedgepeth v. United States, 124 U.S.App.D.C. 291, 364 F.2d 684, 687 (1966). *See also* United States v. Rucker, 150 U.S.App.D.C. 314, 464 F.2d 823, 825 (1972) ("When the delay approaches a year and a half, . . . the Government must provide a justification which convincingly outweighs the prejudice [to the defendant] which can normally be assumed.").

13. The majority suggests that the first eight months of delay were due to appellant since he had two changes of counsel. It also at-

this unusual delay since an additional factor is present—the loss of the government informant occasioned by the delay—that clearly swings the balance in appellant's favor.

The majority rejects this claim, holding that "it is not reasonable to conclude that the informant would . . . provide any significant aid to the defense." Requiring appellant to make such a showing, however, rests on an erroneous application of the governing case law. In this jurisdiction, he need only establish "a reasonable possibility of prejudice," [14] or "[e]ven a slight showing of possible prejudice." [15] And the Supreme Court has stated that "[i]f witnesses die or disappear during a delay, the prejudice is obvious," since a defendant is thereby hindered in "prepar[ing] his case." Barker v. Wingo, 407 U.S. 514, 532, 92 S.Ct. 2182, 2193, 33 L. Ed.2d 101 (1972). Moreover, in *Roviaro, supra,* in a factual setting virtually identical to the instant case, the Supreme Court said, "[t]he circumstances

of this case demonstrate that [the informant's] possible testimony was highly relevant and *might have been helpful* to the defense." 353 U.S. at 63–64, 77 S. Ct. at 629 (emphasis supplied). Thus, appellant was prejudiced as a matter of law,[16] and the court was obliged to uphold his challenge.

In fact, appellant was precluded from making a further showing of prejudice resulting from the loss of the informant since the majority also sustained the government's failure to disclose his identity until *after* he had disappeared. Nonetheless, even *before* appellant knew that the informant had disappeared he explicitly advised the court that he would be prejudiced by such an event because the informant might substantiate his claims that certain phone conversations used against him were illegally obtained and that he was entrapped by the government. Thus, appellant's claim of prejudice was clearly not an after-thought raised on appeal. In the face of a twenty-seven month delay, I fail to see

---

tributes an additional seven months to the fact that appellant moved to transfer his Maryland indictment to the District of Columbia. The remaining twelve months it *simply holds* were not "arbitrary, purposeful, oppressive or vexatious." This conclusion fails to understand the nature and purpose of the right to a speedy trial: "In our jurisdiction it is peculiarly appropriate to hold the Government to the obligation of arranging a speedy trial." United States v. Holt, 145 U.S.App.D.C. 185, 448 F.2d 1108, 1111 (1971) (opinion of Leventhal, J.). Thus, the government was under an affirmative obligation to move rapidly in those twelve months, particularly since seven of them followed an eight month delay due to changes in counsel, and five of them followed a twenty-two month delay. *See* Hedgepeth v. United States, 124 U.S.App.D.C. 291, 364 F.2d 684, 688 (1966) ("The passing of such a considerable length of time, no matter who is 'at fault,' *should act as a spur to the* Government to seek prompt trial. If the Government is lax in this regard, it is appropriate to take the earlier period into account.").

Moreover, even the fifteen months attributed in whole or part to appellant by the majority were inaccurately apportioned. Appellant's first counsel, who was retained,

was disbarred shortly after being hired—a circumstance hardly attributable to appellant. A court-appointed attorney was then assigned to appellant; three and one half months later this court-appointed attorney was dismissed, and another counsel retained. The record does not indicate why an attorney was appointed and then dismissed. This delay, therefore, may not have been due to appellant. Finally, the Maryland court did not act on appellant's transfer motion for seven months. This considerable delay cannot be attributed wholly to appellant simply because he made the motion to transfer. In sum, appellant was responsible for only a small portion of the twenty-seven month delay.

14. United States v. Holt, 145 U.S.App.D.C. 185, 448 F.2d 1108, 1110 (1971) ; Hedgepeth v. United States, 124 U.S.App.D.C. 291, 364 F.2d 684, 687 (1966) ; Hedgepeth v. United States, 125 U.S.App.D.C. 19, 365 F.2d 952, 954 (1966).

15. Harling v. United States, 130 U.S.App.D. C. 327, 401 F.2d 392, 395 (1968). *See also* Coleman v. United States, 142 U.S.App.D.C. 402, 442 F.2d 150, 156 (1971).

15. Harling v. United States, 130 U.S.App.D. 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970).

how my brethren càn conclude that there was "no possibility of prejudice" to appellant in these circumstances. Accordingly, I would reverse his convictions with instructions to the trial court to dismiss his indictments.